UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____
                                        )
KHADIJAH TRIBBLE,                       )
                                        )
                 Plaintiff,             )
                                        )
v.                                      )
                                        )
CURALEAF HOLDINGS, INC.,                )      C.A. No. 1:24-cv-12760-IT
MATTHEW DARIN                           )
                                        )
                 Defendants.            )
_____ )

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      Plaintiff Khadijah Tribble ("Ms. Tribble" or the "Plaintiff") is an African American woman formerly employed by Defendant Curaleaf Holdings, Inc. ("Curaleaf" or the "Company") as Vice President, Corporate Social Responsibility and as Senior Vice President, Corporate Social Responsibility. In those roles, Ms. Tribble spearheaded numerous initiatives, including issuing Curaleaf's first major social responsibility report. As a result, *Green Market Report* named Ms. Tribble "woman of the year," and Curaleaf's chairman lauded her as an "industry leading expert on social responsibility". Despite Ms. Tribble's achievements, Curaleaf paid her significantly less than it paid her white, male peers. The Company also failed to address sexual harassment that Ms. Tribble suffered in the course of her employment, including without limitation, at a company dinner in which a white, male colleague asked Ms. Tribble "Have you ever had any Irish in you?" Ms. Tribble filed a complaint with Human Resources based on this incident, after which Curaleaf and Defendant Matthew Darin ("Mr. Darin"), the Company's

CEO, (together, the "Defendants") subjected her to increasing retaliation, including without limitation by restructuring leadership in the Company so that she no longer reported to the CEO, interfering with her efforts to obtain a promotion, forcing her to dramatically reduce her staff due to a phantom "budget cut," and by failing to remedy a threat to harm Ms. Tribble made by a Curaleaf vendor. This escalating course of retaliation culminated in March 2023, when Curaleaf terminated Ms. Tribble's employment and refused to pay her earned bonus on the heels of her request to use her purportedly "unlimited" paid time off (PTO) to address mental health conditions stemming from Defendants' conduct. These actions and omissions violate numerous Massachusetts employment laws, including the Massachusetts Fair Employment Practices Act, G.L. c. 151B, the Massachusetts Equal Pay Act, G.L. c. 149, § 105A, the Massachusetts Wage Act, G.L. c. 149, § 148, and the Massachusetts Earned Sick Time Law, G.L. c. 149, § 148C.

## PARTIES

2.      Ms. Tribble is a natural person who resides in Massachusetts.

3.      Curaleaf is a Delaware corporation with a principal place of business located in Stamford, Connecticut with an office in Wakefield, Massachusetts.

4.      Mr. Darin is a natural person who Curaleaf employed at all times relevant to this Complaint and who, on information and belief, resides in Illinois and/or Florida.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000, and Ms. Tribble is a citizen of Massachusetts, and the Defendants are citizens of other states.

6.     Venue properly lies with the United States District Court for the District of Massachusetts because Ms. Tribble worked in Massachusetts and the unlawful conduct set forth herein occurred here in Massachusetts.

**FACTS**

7.     Curaleaf is a cannabis company whose headquarters were located in Wakefield, Mass., throughout Ms. Tribble's employment.

8.     Curaleaf hired Ms. Tribble in March 2020 as Vice President, Corporate Social Responsibility at an annual salary of $200,000 with eligibility for a target bonus of 25% (i.e. $50,000 annually).

9.     On her hire, Ms. Tribble reported to Jason White ("Mr. White"), the then-Chief Marketing Officer. Following Mr. White's departure in March 2021, Ms. Tribble reported directly to the then-CEO Joseph Bayern ("Mr. Bayern").

10.     At all times relevant to this complaint, Mr. Darin was President of Curaleaf, and beginning in or about May 2022, was CEO of Curaleaf.

11.     As Vice President, Corporate Social Responsibility, Ms. Tribble oversaw Curaleaf's diversity, equity and inclusion initiatives, as well as its efforts to build an ecosystem of impact, policy, and business aligning with the greater good for both the cannabis industry and the communities in which Curaleaf operated and served.

12.     Ms. Tribble worked largely remotely, often at night and on weekends, and travelled frequently throughout her employment with Curaleaf.

13.     In accordance with her job duties, Ms. Tribble consistently advocated, without limitation, for greater diversity within Curaleaf's leadership, as well as for equitable opportunities for hiring and advancement throughout the Company.

14.    Once he became CEO, Ms Tribble began reporting directly to Mr. Darin.

15.    During Ms. Tribble's employment and after her separation, Mr. Darin periodically traveled to Massachusetts, including to Curaleaf's Massachusetts-based headquarters.

16.    Ms. Tribble made enormous strides in advancing the Company's social impact agenda and profile by creating Curaleaf's first legitimate diversity, equity and inclusion programing as well as the Company's culture around social governance, including DEI and employee resources groups.

17.    In 2022, Ms. Tribble issued Curaleaf's first major social responsibility report, titled, "Rooted in Good." As a result, *Green Market Report* named Ms. Tribble "Woman of the Year", *Forbes* listed her as a "Woman of Impact," and the Company won numerous awards and recognition for the report, which was her brainchild.

18.    Boris Jordan ("Mr. Jordan"), Curaleaf's Chairman and its current CEO, introduced Ms. Tribble as the new interim CEO for the United States Cannabis Council and lauded her as the "industry leading expert on social responsibility" at the 2022 Benzinga Awards in Chicago, and Mr. Darin, then Curaleaf's CEO, remarked that Ms. Tribble's report had inspired him to make culture his #1 issue at Curaleaf.

19.    Regrettably, these executives' praise for Ms. Tribble's work and for the value of DEI overall was hollow and disingenuous.

20.    Despite Ms. Tribble's efforts, her achievements and Curaleaf's professed values, she repeatedly encountered a disregard for basic employment rights during the three years in which she worked for the Company.

21.    Curaleaf's "C-Suite," which included Ms. Tribble at one point during her employment, almost entirely consisted of white males.

22.     In 2021, Ms. Tribble learned that the Company paid her significantly less than her largely white male peers on the leadership team when Mr. Bayern told her that "she was not being paid properly," that "we have to get you on par with the rest of the leadership team," that "you are one of the ones we need to get competitive pay [for]" or words to that effect, and that "there are people in the company who are underpaid according to their title and contribution [and] you are one of them," or words to that effect.

23.     While Ms. Tribble's salary increased to $225,000 in August 2021, on information and belief, she still earned less than her peers at Curaleaf as Mr. Bayern informed her that he could only increase her salary by an amount that he admitted still failed to achieve pay equity.

24.     Mr. Bayern also said to Ms. Tribble, "You have earned a senior leadership role and we will work to align your payment with the promotion," or words to that effect.

25.     In the Spring of 2022, Curaleaf promoted Ms. Tribble to the role of Senior Vice President, Corporate Social Responsibility, increasing her salary to $275,000 with eligibility for an increased target bonus of 40% of her salary (i.e. $110,000).

26.     Yet, based on information and belief and the then-CEO's admissions, Ms. Tribble's compensation, as a black woman, *still* failed to align with that of her white, male peers at the executive level within Curaleaf.

27.     Following her promotion, Ms. Tribble attended a Company dinner in Los Angeles in March 2022, at which—during a discussion about cultural identity and appropriation— Curaleaf's Senior Vice President of Wholesale, Patrick Larkin ("Mr. Larkin") asked Ms. Tribble, "Have you ever had any Irish in you?"

28.     Mr. Larkin's wildly inappropriate and degrading sexual comment shocked and deeply embarrassed Ms. Tribble.

29.     Moreover, by uttering this vile remark in the presence of co-workers, including Ms. Tribble's subordinates, Asya Hill and Raheem Uqdah, he made it all the more disturbing and stigmatizing for Ms. Tribble.

30.     Colleagues later told Ms. Tribble that Mr. Larkin had a history of making inappropriate sexual remarks in the workplace.

31.     Curaleaf's response to Mr. Larkin's sexual harassment of Ms. Rivers was underwhelming as Curaleaf's Chief People Officer, Tyneeha Rivers ("Ms. Rivers"), subsequently admitted.

32.     The day after the incident, Ms. Tribble attended a lunch with Mr. Darin, which had been scheduled prior to the incident with Mr. Larkin.

33.     At the time, Ms. Tribble had not yet determined how to proceed with respect to Mr. Larkin's sexual harassment as she was considering not only herself but also her subordinates, who had expressed their own distress over Mr. Larkin's behavior, which they all recognized (correctly) to be sexual harassment.

34.     Ms. Tribble did not intend to broach the incident with Mr. Darin, at least not then. Instead, she was contemplating filing a formal complaint with Human Resources.

35.     At their lunch, Mr. Darin brought up Mr. Larkin's remark himself, but in a manner that utterly ignored the severity of Mr. Larkin's misconduct and its harm to Ms. Tribble.

36.     Mr. Darin told Ms. Tribble that he had heard about what had happened, and he then purported to apologize on Mr. Larkin's behalf, stating, "It was in poor taste, but he didn't mean anything by it," or words to that effect.

37.     Mr. Darin neither asked Ms. Tribble for her version of events nor how she felt.

38.    Instead, Mr. Darin seemed to be sweeping Mr. Larkin's misconduct under the rug and preemptively telling Ms. Tribble to move on.

39.    Ms. Tribble persevered, however, and filed a complaint of sexual harassment against Mr. Larkin shortly after her lunch with Mr. Darin.

40.    Although Curaleaf apparently interviewed Ms. Tribble's subordinates, the Company never provided an investigatory report or a finding to Ms. Tribble (nor likely issued any at all).

41.    Further, from all appearances, the Company never disciplined Mr. Larkin in any substantive way, or indeed at all.

42.    Instead, over the course of the ensuing year, Ms. Tribble experienced considerable backlash, particularly from Mr. Darin, who became Curaleaf's CEO in May 2022.

43.    Much of this illegal retaliation was directed at Ms. Tribble while she was working here in Massachusetts, where she was based at all relevant times.

44.    During the time that Ms. Tribble reported to Mr. Darin, the two held check-in meetings, including while Ms. Tribble was in Massachusetts.

45.    Ms. Tribble reached out to Mr. Darin, from Massachusetts, to congratulate him on his promotion and to express her interest in serving as Chief Strategy Officer or Mr. Darin's Chief of Staff.

46.    Shortly thereafter, in or about April or May 2022, Mr. Darin told Ms. Tribble that he did not want to hire her in the position of Chief Strategy Officer and that he wanted to hire another candidate (a white, straight, male) whom he had already interviewed for the role.

47.     Likewise, Ms. Rivers also told Ms. Tribble that Mr. Darin was instead eager to hire the straight, male candidate, Mitch Hara ("Mr. Hara"), who had not even applied for that role.

48.     On information and belief, a job description for the Chief Strategy Officer role had not even been posted or created at that point in time.

49.     Mr. Darin indeed went on to select Mr. Hara, over Ms. Tribble, for the role of Chief Strategy Officer.

50.     Thereafter, Ms. Tribble responded that she intended to apply for the position of Chief of Staff to which Mr. Darin replied, stating that he would not stop her from applying.

51.     Curaleaf eventually renamed the Chief of Staff position as the Executive Administrator, and Mr. Darin gave this position to his administrative assistant, a white, straight woman.

52.     This employee had worked for Mr. Darin in a largely clerical role and was not well-qualified for what remained an executive position.

53.     Despite Mr. Darin's representations, Ms. Tribble was never able to apply for either the Chief of Staff or Chief Strategy Officer roles.

54.     After hiring Mr. Hara, Mr. Darin "restructured" Curaleaf's leadership so that Ms. Tribble no longer reported to him, as CEO, but instead reported to the newly hired Chief Strategy Officer.

55.     Ms. Tribble found that she was increasingly excluded from C-Suite meetings, on information and belief, at Mr. Darin's instructions.

56.     In effect, Mr. Darin had not only declined Ms. Tribble opportunities to compete for promotion but had actually demoted Ms. Tribble.

57.     Ms. Rivers, also an African American woman, spoke with Ms. Tribble about her own experience being excluded from C-Suite meetings.

58.     Ms. Rivers stated during a meeting, which Ms. Tribble attended, that she and the Chief Information Officer, a woman, were "chiefs in name only because they were often excluded from meetings with the Chairman, the CEO, the Chief Strategy Officer, the Chief Financial Officer, and the Chief Legal Officer," or words to that effect.

59.     Near the end of 2022, Curaleaf doubled down on its illegal conduct in connection with Ms. Tribble's employment.

60.     In January 2023, the Company conducted a reduction in force (RIF), impacting several departments, including the Corporate Social Responsibility department.

61.     Mr. Darin was responsible as CEO for aligning the budget of Curaleaf and participated, and potentially even drove, the decision to mandate the RIF in Ms. Tribble's department.

62.     Curaleaf instructed Ms. Tribble to terminate half of this department, ostensibly, to reflect budget cuts in connection with the purported RIF.

63.     Ms. Tribble later learned that Curaleaf had not cut her department's budget at all; in fact, the Company had approved the same budget for the Corporate Social Responsibility department that Ms. Tribble had submitted prior to being ordered to halve her staff.

64.     Instead, Curaleaf had used "budget issues" as a pretext to justify dramatically cutting Ms. Tribble's staff in an effort to punish her, demoralize her, impede her ability to perform her job, and further reduce her authority and influence within the Company.

65.     In January 2023, during a Twitter Space Event in New York City in which Ms. Tribble participated, Mr. Jordan referred to people in the criminal justice system with cannabis violations, many of whom are persons of color, as "thugs."

66.     Mr. Jordan also stated that New York regulators had subjected Curaleaf to actions that amounted to "reverse discrimination."

67.     Mr. Jordan also referred to immigrants as "illegals."

68.     Ms. Tribble vocally objected to Mr. Jordan's racist commentary, including and without limitation, by speaking with Mr. Darin in a phone call in which Ms. Tribble participated form Massachusetts.

69.     In response, Mr. Darin dismissed Ms. Tribble's concerns and told her on the call that Mr. Jordan's statements were merely taken "out of context," or words to that effect.

70.     Curaleaf made no effort to address Mr. Jordan's comments, again despite its affirmative obligations under Massachusetts law to investigate and address complaints of discrimination, harassment and retaliation.

71.     On or about January 17, 2023, a Curaleaf vendor left a voicemail for Ms. Tribble that amounted to a death threat.

72.     Although informed of the threat its vendor had made on Ms. Tribble's life, Curaleaf failed to respond in any meaningful way for some time.

73.     Ms. Tribble promptly sent the voicemail by text message, again from Massachusetts, to both Mr. Darin and her direct supervisor, but neither of them took any action whatsoever.

74.     Instead, Ms. Tribble had to contact a Curaleaf in-house attorney herself, and after several weeks, the Company issued a cease-and-desist letter to the vendor through outside counsel.

75.     The entire ordeal was traumatic for Ms. Tribble, who had to cancel travel and public speaking events while Curaleaf dragged its heels in responding to her complaints, the increasing retaliation, and the threat to her life.

76.     Unsurprisingly, Mr. Darin's disregard for Ms. Tribble's physical and mental well-being, the nearly eight months of retaliation, and Curaleaf's underwhelming response to the threat on her life took a serious toll on Ms. Tribble's mental health.

77.     In January 2023, on a day on which Ms. Tribble was working on the purported RIF, Ms. Tribble experienced difficulty moving and catching her breath while she was at a previously scheduled doctor's appointment.

78.     Ms. Tribble became sweaty, her heart was racing, and her blood pressure was elevated.

79.     Ms. Tribble's physician said she was concerned that Ms. Tribble could be having a heart attack and ordered her to take an ambulance to an Emergency Room.

80.     At the ER, Ms. Tribble was diagnosed with having had an anxiety, or panic, attack.

81.     Ms. Tribble thereafter informed Human Resources and the remaining members of her own team that she had had an anxiety attack.

82.     Ms. Tribble developed anxiety disorder and insomnia, for which she has undergone treatment for some time.

83. Ms. Tribble was transparent with the Company about her mental health conditions.

84. Without limitation, after the threat, Ms. Tribble spoke with Mr. Darin, Mr. Hara, Mr. Rivers, in-house counsel, and an HR specialist employed by Curaleaf about her need for a "mental health break."

85. On or about February 2, 2023, Mr. Darin called Ms. Tribble, while she was in Massachusetts, and they spoke about Ms. Tribble's concerns about the Company's social-responsibility efforts, and her concerns about Mr. Boris's racist remarks.

86. In February 2023, Ms. Tribble opted to use Curaleaf's purportedly "unlimited" PTO policy to take a reasonable amount of time off for her mental health, beginning on February 21, 2023.

87. Ms. Tribble understood that Curaleaf touted its "unlimited" PTO as a valuable benefit for executive employees and rightly understood that she too was entitled to that benefit.

88. Curaleaf did not inform Ms. Tribble that she could not use its so-called "unlimited" PTO policy for medical purposes.

89. In any event, Ms. Tribble's PTO request due to her mental health symptoms triggered Curaleaf's obligations under disability discrimination laws, including M.G.L. c. 151B.

90. Feeling pressure to resume work quickly, Ms. Tribble returned on March 7, 2023, with the knowledge of her supervisor, Curaleaf's General Counsel, Peter Clateman ("Mr. Clateman").

91. On returning to work with Curaleaf's knowledge, Ms. Tribble was surprised to receive the following email from Ms. Rivers on the morning of March 8, 2023:

*Khadija, I would ask you that very question. Are you returning to work today, or have you decided to resign? Your messaging has not been clear and we as a*

*management team are very confused on your direction. You have been communicating to team members that you have left, and stated to Matt you were unsure of your decision. Again, we just need to know if you are continuing your employment with us as you are scheduled to return to work today.*

*Please let us know the direction that you have decided asap, not later than the end of the day. If we don't hear back from you by the end of the day, we will consider you [to] have resigned and accept your resignation effective March 8, 2023. Our goal is to support your decision on whatever direction you have decided.*

*Thanks,*

*-Tyneeha*

92.     Ms. Tribble responded in less than two hours, reiterating both the date she *had*

resumed work (the day prior) and the reasons for her PTO request, as follows:

*Tyneeha and Peter,*

*I haven't heard from you regarding my earlier email and request.*

*As I stated earlier I returned to work yesterday and you should know that I've continued experiencing anxiety and symptoms of panic attacks that have only amplified today.*

*This is the reason I've asked for additional time.*

*I have been working with my clinicians to secure follow up appointments from my January emergency room visit.*

*What additional information do you need to process this request?*

*Khadijah*

93.     Neither Ms. Rivers nor Mr. Clateman responded to Ms. Tribble's email.

94.     As Curaleaf's business records should confirm, Ms. Tribble worked on March 8,

2023 and on March 9, 2023.

95.     Inexplicably, on the morning of March 10, 2023, Ms. Rivers presented Ms.

Tribble with a severance agreement and Curaleaf cut off Ms. Tribble's access to its systems.

96.    Curaleaf also rescinded its obligation to pay Ms. Tribble her 2022 "bonus," which would have been paid that day, in the previously committed amount of $30,250.

97.    Curaleaf informed Ms. Tribble that she could only receive her bonus if she executed the severance agreement through which the Company sought to release Ms. Tribble's claims and to resuscitate otherwise unenforceable and overbroad restrictive covenants.

98.    In other words, Curaleaf would only pay Ms. Tribble's *earned* compensation if she stopped working in the cannabis industry *and* if she waived all legal claims related to her employment, compensation and separation.

99.    Curaleaf also failed to pay Ms. Tribble her wages for work on March 8 and 9 on the date of her termination.

100.    Historically, Ms. Tribble had included Mr. Darin on communications concerning pay-equity and increases in pay for leadership positions, and indeed Mr. Darin told Ms. Tribble that he wanted to be a party to those conversations.

101.    Throughout Ms. Tribble's employment, Mr. Darin was actively involved in, or at least consistently aware of, pay decisions vis-à-vis Curaleaf's leadership, including Ms. Tribble.

102.    Under Curaleaf's existing policies and in accordance with prior practice at Curaleaf, Mr. Darin had input into the decision to terminate Ms. Tribble's employment, in the calculation of her 2022 bonus, and in Curaleaf's decision not to pay that bonus.

103.    Over the weekend of March 11-12, 2023, Ms. Tribble wrote an email to Ms. Rivers and Mr. Clateman clarifying that Curaleaf had indeed terminated her employment, as she did not want to be accused of failing to work on Monday, notwithstanding the appearance that Curaleaf had terminated her on Friday, March 10, 2023.

14

104.    In response, Ms. Rivers stated that Ms. Tribble had resigned, effective March 8, 2023.

105.    Ms. Tribble did not resign from her job at Curaleaf.

106.    No evidence whatsoever supports Curaleaf's bizarre position that Ms. Tribble resigned, and her March 8, 2023 email, quoted above, and the fact that she worked in her capacity as a *Curaleaf* employee on March 7-9, 2023 explicitly rebuts that assertion.

107.    Prior to filing suit, Ms. Tribble filed a timely complaint with the Massachusetts Commission Against Discrimination (MCAD) against Curaleaf and Mr. Darin concerning the allegations of discrimination and retaliation asserted herein.

108.    More than ninety (90) days have passed since Ms. Tribble filed her MCAD charge.

109.    Ms. Tribble also filed a complaint with the Massachusetts Attorney General's Office concerning Curaleaf's refusal to pay her earned compensation.

## PLAINTIFF'S CLAIMS

### -COUNT I-
### DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF G.L. c. 151B, § 4(1)
### (v. Curaleaf)

110.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully set forth herein.

111.    Mr. Larkin sexually harassed Ms. Tribble at a work event in front of her subordinates by asking Ms. Tribble "Have you ever had any Irish in you?"

112.    Although Ms. Tribble filed a complaint of sexual harassment against Mr. Larkin and informed Mr. Darin of the sexual harassment, Curaleaf failed to conduct a prompt, good-faith investigation and take remedial action in response to Mr. Larkin's misconduct.

113.    Curaleaf subjected Ms. Tribble to additional discrimination on the basis of her gender, through the actions and omissions set forth herein, including without limitation, by paying her less compensation than one or more of her male peers for comparable work, by failing to increase her compensation to match the compensation earned by her male peers, and by otherwise subjecting her to unfair and disparate terms of employment.

114.    In so doing, Curaleaf violated G.L. c. 151B, § 4(1).

115.    As a result of this unlawful discrimination on the basis of her sex, Ms. Tribble has suffered damages.

## -COUNT II-
## DISCRIMINATION ON THE BASIS OF RACE/COLOR IN VIOLATION OF G.L. c. 151B, § 4(1)
### (v. Curaleaf)

116.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully set forth herein.

117.    Curaleaf subjected Ms. Tribble to discrimination based on her race and color through the actions and omissions set forth herein, including without limitation by paying her less compensation than one or more of her white peers for comparable work, by failing to increase her compensation to match the compensation earned by her white peers, and by terminating her employment.

118.    In so doing, Curaleaf violated G.L. c. 151B, § 4(1).

119.    As a result of this unlawful discrimination on the basis of her race and color, Ms. Tribble has suffered damages.

**-COUNT III-**
**DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF G.L. c. 151B,**
**§ 4(16)**
**(v. Curaleaf)**

120.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully set forth herein.

121.    Together or separately, Ms. Tribble's anxiety disorder and insomnia substantially impair, without limitation, her major life activities of sleeping, communicating, breathing, and concentrating.

122.    Ms. Tribble's anxiety disorder and insomnia constitute disabilities (sometimes called a "handicap") under G.L. c. 151B, § 4(16).

123.    At all times relevant, Ms. Tribble was a qualified individual with a disability.

124.    Curaleaf failed to provide Ms. Tribble reasonable accommodations in violation of G.L. c. 151B, § 4(16).

125.    Although aware of Ms. Tribble's disability and her resulting need for accommodation, Curaleaf failed to engage in a meaningful interactive dialogue with Ms. Tribble to provide her with reasonable accommodation(s).

126.    The termination of Ms. Tribble's employment resulted either in whole or in part from her disability.

127.    In so doing, Curaleaf violated G.L. c. 151B, § 4(16).

128.    As a result of this unlawful discrimination on the basis of her disability, Ms. Tribble has suffered damages.

17

**-COUNT IV-**
**RETALIATION IN VIOLATION OF G.L. c. 151B, § 4(4)**
**(v. all Defendants)**

129.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully set forth herein.

130.    Ms. Tribble engaged in conduct protected by G.L. c. 151B by, including without limitation, filing a complaint with Human Resources following Mr. Larkin's sexual harassment and by complaining to Mr. Darin of Mr. Jordan's racist statements.

131.    Curaleaf and Mr. Darin subjected Ms. Tribble to retaliation for her protected conduct by, including without limitation, restructuring the leadership team such that Ms. Tribble no longer reported to the CEO and was no longer a C-Suite executive, interfering with Ms. Tribble's efforts to secure a promotion, forcing Ms. Tribble to dramatically reduce her staff due to a purported "budget cut" that never materialized, effectively demoting Ms. Tribble, and by refusing to pay Ms. Tribble her earned bonus compensation unless she waived all legal claims related to her employment and agreed to no longer work in the cannabis industry.

132.    In so doing, Curaleaf and Mr. Darin violated G.L. c. 151B, § 4(4).

133.    As a result of this unlawful retaliation for engaging in protected conduct, Ms. Tribble has suffered damages.

**-COUNT V-**
**FAILURE TO INVESTIGATE IN VIOLATION OF G.L. c. 151B, § 4(1)**
**(v. Curaleaf)**

134.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully set forth herein.

135.    Curaleaf, through Human Resources and Mr. Darin, had knowledge that Ms. Tribble was subjected to unlawful discrimination.

18

136.    Curaleaf had an obligation under G.L. c. 151B, § 4(1) to conduct a thorough, good-faith, and neutral investigation into Ms. Tribble's internal complaints of discrimination.

137.    Despite this knowledge, Curaleaf failed to comport with its affirmative obligation to investigate the unlawful discrimination that Ms. Tribble had reported.

138.    Curaleaf's failure to conduct a thorough, good-faith, and neutral investigation into Ms. Tribble's internal complaints further violated G.L. c. 151B, § 4(1).

139.    As a result of Curaleaf's failure to investigate such unlawful discrimination, Ms. Tribble has suffered damages.

### -COUNT VI-
### AIDING AND ABETTING IN VIOLATION OF G.L. c. 151B, § 4(5)
### (v. Matthew Darin)

140.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully set forth herein.

141.    As set forth herein, Mr. Darin aided, abetted, incited, compelled, and/or coerced actions forbidden under G.L. c. 151B, which itself violates G.L. c. 151B, § 4(5).

142.    As a result of Mr. Darin aiding, abetting, inciting, compelling, and/or coercing actions forbidden under G.L. c. 151B, Ms. Tribble has suffered damages.

### -COUNT VII-
### INTERFERENCE WITH RIGHTS IN VIOLATION OF G.L. c. 151B, § 4(4A)
### (v. Matthew Darin)

143.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully set forth herein.

144.    As set forth herein, Mr. Darin unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Tribble's exercise and enjoyment of rights granted or protected under G.L. c.

151B, to wit Ms. Tribble's right to be free from discrimination on the basis of her sex, race, and disability.

145.    As a result of Mr. Darin unlawfully coercing, intimidating, threatening, and/or interfering with Ms. Tribble's exercise and enjoyment of rights granted or protected under G.L. c. 151B, she has suffered damages.

### -COUNT IX-
### VIOLATION OF THE MASSACHUSETTS EQUAL PAY ACT, G.L. c. 149, § 105A
### (v. Curaleaf)

146.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully set forth herein.

147.    Curaleaf violated the Massachusetts Equal Pay Act, G.L. c. 149, § 105A by paying her less compensation than one or more of her male peers for comparable work and by failing to increase her compensation to match the compensation earned by her male peers.

148.    As a result of this unlawful pay discrepancy, Ms. Tribble has suffered damages.

### -COUNT X-
### NON-PAYMENT OF WAGES IN VIOLATION OF THE MASSACHUSETTS WAGE
### ACT, G.L. c. 149, § 148
### (v. all Defendants)

149.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully set forth herein.

150.    Curaleaf and Mr. Darin violated the Massachusetts Wage Act, G.L. c. 149, § 148 by refusing to pay Ms. Tribble her earned bonus and by failing to pay her all-earned wages on the date of her termination.

151.    Mr. Darin is individually liable under the Wage Act.

152.    Under G.L. c. 149, § 148, Curaleaf is required to pay its employees all earned

compensation in a timely fashion when they are due and owing as well as all earned

compensation to terminated employees on the date of termination.

153.    As a result, Curaleaf and Mr. Darin have deprived Ms. Tribble of her earned

compensation, causing her financial losses, thereby entitling her to treble damages, costs, and

attorneys' fees under G.L. c. 149, § 150.

**-COUNT XI-**
**RETALIATION IN VIOLATION OF THE EARNED SICK TIME LAW,**
**G.L. c. 149, § 148C**
**(v. all Defendants)**

154.    Ms. Tribble hereby repeats and reavers the allegations set forth above, as if fully

set forth herein.

155.    By availing herself of Curaleaf's purportedly "unlimited" PTO policy to take a

reasonable amount of time off for her mental health, beginning on February 21, 2023, Ms.

Tribble utilized earned paid sick time to which she was entitled under M.G.L. c. 149, § 148C(b)-

(c)(2).

156.    Defendants had notice of Ms. Tribble's use of Curaleaf's purportedly "unlimited"

PTO as earned paid sick time to address her mental health.

157.    After learning of Ms. Tribble's use of Curaleaf's purportedly "unlimited" PTO as

earned sick time to address her mental health, Defendants terminated Ms. Tribble's employment

with Curaleaf.

158.    Defendants terminated Ms. Tribble's employment with Curaleaf in retaliation of

her use of Curaleaf's purportedly "unlimited" PTO as earned paid sick time to address her mental

health.

159.    As a result, Ms. Tribble has suffered damages.

## PRAYER FOR RELIEF

Plaintiff Khadijah Tribble prays that this Honorable Court award judgment in her favor and against each of the Defendants, Separately, jointly and severally, for the following relief:

1.      compensatory damages, including compensation for emotion distress;

2.      lost wages, including back pay, lost benefits, and front pay;

3.      unpaid wages;

4.      liquidated damages;

5.      punitive damages;

6.      attorneys' fees;

7.      costs and expenses of this action;

8.      prejudgment and post-judgment interest; and

9.      such further relief as this Court deems fair and just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on every claim so triable.

Respectfully submitted,

KHADIJAH TRIBBLE,
Plaintiff,
By Her Attorneys,

Dated: January 27, 2025

*/s/ Michaela C. May*
Todd J. Bennett (BBO# 643185)
tbennett@bennettandbelfort.com
Michaela C. May (BBO# 676834)
mmay@bennettandbelfort.com
Zachary H. Hammond (BBO# 696465)
zhammond@bennettandbelfort.com
Bennett and Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141
(617) 577-8800

## <u>CERTIFICATE OF SERVICE</u>

I, Michaela C. May, hereby certify that on this 27th day of January 2025 the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Michaela C. May*_____
